initial petition was filed in May of 2012. The mother should have been required to show serious endangerment to the child's health, welfare, well-being as a basis for modification of custody. She was not and did not at that point in time. Less than one month later, the statute was amended. I'm talking about Section 610 of the IMDMA, was amended to include two additional provisions, paragraphs F and G, which have to do with military deployments and how that affects the service member's contact with the children and his custody and visitation. When a second petition was filed to modify custody by the mother in this case in December of 2012, when that was filed, the mother, again, should have been required to show serious endangerment. Now, keep in mind that the original judgment of disillusion was entered in September of 2010. The first petition was filed before the two-year period had elapsed. The second petition was apparently treated as an amended petition by the court. And, in fact, Judge Katz specifically refers to it as an amended petition in her ruling. And if that be the case, if it is truly an amended petition, then it's a single petition that relates back. And there's a case, I didn't put it necessarily in the brief, and I only point this out for a collateral purpose here in just a moment. But there is a case from 1992, a fourth district case, which specifically states that amended petition- This is not in the brief. This is not in the brief. Counsel, are you aware of this case? Are you ready to bestow? Yeah. You're not allowed to argue any case that you don't decide. Okay. If so, you file a motion to amend, and we'll give the opposite side equal time to answer. Well, the only reason I bring it up is because it results in an order that was entered on a temporary basis that was used by Judge Katz in her final decision as a primary basis for modifying custody in this matter. And so as a result, then, at hearing in April of 2013, she enters an order which modifies custody. And the standard for modification of custody is under 610, requiring by clear and convincing evidence that there's been a substantial change in circumstances that is in the best interest of the children. And I go through in great detail laying out all the facts, but there's a few things that I want to point out with respect to it. First and foremost, with respect to the substantial change in circumstances itself, there is some mistakes that I think the trial court made with respect to analyzing the evidence. And I lay those out in great detail in the brief, item by item, along those lines. But a couple of things jump out. First of all, with respect to paragraph 610G, which had been in effect then at that point in time, because remember this was passed effective June 1st, 2013, and it kind of intervened between the time of the initial petition in May of 2012. I'm sorry, I said June 1st of 2013. I mean June 1st of 2012. The initial petition was filed in May of 2012. A second petition is filed in December of 2012. Intervening between those two, of course, is the effective dates of subparagraphs G and F of section 610 of the IMDMA, which was passed in the meantime and became effective. Intervening with respect to those is the statute that addresses military deployments. And one of the things that the court specifically cited was the unilateral actions on the part of the father. In this case, the unilateral use of the memorandum of understanding that he submitted and the removal to Missouri during the deployment of 2012. Paragraph 610G appears to address these issues. Both of those things were done by the father in this case as a result of his deployment. And the purpose behind G, it's a brand new statute. It's only about a year and four months old. The purpose behind G is not to penalize the service member in a situation where his deployment, where he has custody and his deployment interferes with his ability to do all of the things that he's supposed to do. In fact, in paragraph G, it specifically states that a failure to comply with the court's orders on custody, visitation, or parenting time. The items that the court cited as part of its basis for modifying custody didn't even relate to going so far as the father not allowing custody or visitation on the part of the mother. In fact, he offered the mother to continue to have not only her regular visitation, but all the visitation that she was entitled to under her original judgment of disillusion. And his offer to do that shows flexibility on the part of the father as well as the intent of G, which is not to penalize a father who's in a situation like this where he has custody and he's deployed, not to penalize him with respect to problems associated with visitation during his deployment. And that, I think, was part of what the court, if you take a look at the court's order with respect to its findings, it specifically cites the fact that the father unilaterally made these decisions on his own and specifically uses that as part of its basis against him. Secondly, with respect to the mother's burden of proof at trial, it's by clear and convincing evidence. And if anything, and I go through the facts that are enunciated and found by the court and laid out in the testimony, if anything, the father's case is probably stronger at the time of the modification hearing than it was at the time of the initial custody determination. The reason I say that is, first of all, the mother never got any counseling associated with the sexual assault that she was involved in back in 2008, which went to trial in 2010. All of the counseling that she received predated that initial judgment of disillusion in September 2010. The last time she underwent counseling associated with that was in August of 2010. Per her own testimony from the stand. And she hadn't had any counseling since that point in time. Secondly, she had not been involved with these children at all. Literally was completely uninvolved and essentially ignored them for a 30-month period between the time the father got them in December of 2009, and then they enter a judgment of disillusion in September of 2010, all the way up until May of 2012. She shows up in Illinois and now wants to be mother of the year. And I think that's the biggest problem with the decision in this case. Whatever her arguments were for not being able to come from the state of Utah to go visit, she only had a total of six to seven extended weekends of visitation with these kids over a 30-month period. She was completely uninvolved. I want to stop you there and ask a question. Is it true that your client advised the O'Fallon School District that they were not to release any information about the children to the mother, and that was by court order? The only thing that he did with respect to that, per the testimony of both parties, is on the form that he filled out, there's a block there that he checked saying, do not release information to the other parent. And he checked that block? He did check that block. But then you're also criticizing her for not getting information about them. Well, that would have only occurred after she got here to Illinois. She got no information up to that point in time, and she never testified that she made any attempts to get information from the school and was denied. In fact, the information that she did get was provided by my client, even though he had no obligation to do so. He sent her bags of paperwork every time she did come to visit on these six to seven occasions. So she didn't make any effort up until the time that that form was filled out, and she apparently didn't make any effort after that because there's no testimony by the mother that she was ever denied information by the school. The limit of her argument with respect to this issue is, oh, he checked that block, and that's it. But she never goes beyond that and explains how she called the school, she tried to get information from the school. She never did any of that. Is there any testimony in the record with respect to that issue? Was he confused, or did he really think there was a court order against giving her information? She provided no testimony. No, I'm talking about your client. Oh, with respect to why he checked the box. He said he did it because she was not local, and they wanted a local point of contact,  Did the GAL spoken to the school principal and people there at the school? I didn't try this case, but the GAL put nothing in her report and said nothing on the stand with respect to the mother having made attempts to talk to the principal and being denied information. She put nothing in her report about that. She simply said she had talked to the principal. I'm talking about the GAL now. And she didn't elaborate beyond that about anything the principal might have said with respect to the mother attempting to get information or contact the school. And by the mother's own testimony, she said, I just figured if there was something to be told, I would be told by the dad. And by her own testimony, she didn't make any efforts to contact the school. So if it was a mistake on my client's part, it was a harmless error because she never made any efforts to get any information anyway. So it wouldn't have made any difference. Now, if she had pushed that issue, then that might have opened a whole different set of facts. But that's not our facts. Then with respect to the next thing I want to talk about is one of the issues that has been raised is with regard to these text messages that were sent by my client and used as part of the court's finding with regard to attempting to show that my client is somehow uncooperative, that the father is somehow uncooperative with respect to all of this. These text messages occurred between February of 2012 and May of 2012. That is specifically cited in the court's judgment, February to May of 2012. Now, keeping in mind that she shows up in Illinois in late April of 2012 and then files an immediate petition for temporary custody within a couple weeks after that. But keep in mind what happened just prior to February of 2012. The father just got information that he was being deployed for six months. He relays that to the mother. The mother then scrambles to get orders here to Illinois, and they both know both of those things. The father told the mother that he was being deployed. The mother told the father that she was coming to Illinois. So the tenor of the text messages are that she's going to come to Illinois and take the children while he's deployed. That's why he was angry with regard to the text messages that were specifically limited to that February to May 2012 period, is because what's going on during this time is she hasn't had anything to do with the kids for over two years, and now she's going to swoop in and take the children from him because he's being deployed. That's why he was upset, and that's why the tenor comes out as if somehow he is being uncooperative with respect to the mom. Keep in mind the mother during this time period really didn't show any interest in these children at all. For two and a half years she ignored them. She didn't have any. She had the six, seven visitations I talked about. She didn't have any contact with either schools out there in Las Vegas or the schools here in Illinois. She didn't ask about any of the IEPs even though she knew the Vegas IEP had existed, and she should have thought then that there might be an Illinois IEP. All she had to do was ask, and by the way, some of that was in the paperwork that he did provide her. And then lastly, no cards, no presents, no gifts, no information did she convey to the children during this two and a half year period either. And all of a sudden then she comes in on her orders to transfer here to Illinois in late April of 2012, just before literally he's ready to get on a plane for six months, and she wants to take the children. She's basically a stranger to these children at this point in time. And she convinces the trial judge at that point in time that it would be in the best interest of the children, that there's serious endangerment to the children by virtue of the fact that he told her prior to that, I'm going to send them to my parents' house, but you still get all of your visitation, and then some, even though he told her that, then she still uses that as a basis for saying serious endangerment. Now, a couple other things that I want to point out with respect to the mother's lack of interest in these kids. First of all, she doesn't tell the father. She makes some serious judgmental errors with regard to the children. The first is she doesn't tell the father about Lieutenant McClanahan's threats to the children when he picked them up in December of 2009. This is a serious mistake on her part. He threatened the children directly? Yeah, apparently Lieutenant McClanahan, by her testimony now in the record, she testified to at trial, Lieutenant McClanahan, who sexually assaulted me, now this is her saying this, who sexually assaulted me, has been threatening me and the children. How old are the children at this point? At this point in time in 2009, they would have been five, three, and two maybe. I know the oldest one would have been five, but the other two younger ones would have been younger than that. But she doesn't tell the father when he comes to pick up the children when he got through with his TDY, where he had gone to school, et cetera. He doesn't tell the father at that time, oh, by the way, this guy has threatened the children. And I think that is an indication of the mother's lack of interest in both the care and the safety of these children at that point. Thank you. Thank you. Your Honors, we're here today about two little boys. The little boys are Logan and Tristan. These parents both obviously love their children. They both obviously want to care for their children. And in this situation- I thought that he said there was a third child. There are two children, Logan and Tristan. Logan was five at the time that the custody transferred in 2009. Tristan was three and a half. My client has since had another child who was a baby, an infant, as of last summer, and is still an infant. So technically there are three children, but there are only two at issue. There are three issues that Mr. Gruninger has brought up on appeal. One is the entry of the temporary order. One is the entry of the permanent modification. And then one is also the tax exemption. As far as the temporary order, Mr. Gruninger is correct. My client turned over custody to her at the time husband, Mr. Wenzel, or Mr. Campbell, in December of 2009 because she was being threatened. And as a mother, she felt that the best option for her children would be to get out of that situation. When you say her children, you just mean the two? The two, yes. At that time there were only the two. There was a third. That third one was murdered by someone else. And it was subsequent to all of this, yes. So these children, Logan and Tristan, had been with their mother from the time of their birth until December of 2009. They had been with her only, without Mr. Campbell's presence, from the time that he was deployed, which was in 2008, I think May of 2008 through August of 2008. Then he went to San Antonio, which is the time that they separated, in December of 2008. And she kept the children all the way until December of 2009. She had been the victim of a sexual assault, and she was being held in Utah for the criminal proceedings that were going on in Utah at that time. She felt that she was being threatened. She felt that her children were being threatened. And as the mother of the children, she wanted to get them out of that situation. And therefore, she asked that Mr. Campbell take the children in December of 2009 when he moved to Las Vegas. He was transferred to Nellis Air Force Base in Las Vegas. The testimony shows that at that time, she was about a six-hour drive from Las Vegas, and that she visited as often as she could. She testified that she went several times while they were in Las Vegas. And then the divorce decree was drafted by Mr. Campbell via the Internet, was sent to my client. She signed it while she was in the courthouse on the criminal trial and continued to have as many visits with the children as she could. Then in January of 2011, Mr. Campbell, without leave of court and without written permission and consent from Ms. Wenzel, removed the children from Nevada and moved to the state of Illinois. The testimony indicated Mr. Campbell testified at the trial that Ms. Wenzel had been to visit the children at least three or four times since January of 2011 through the trial in 2013, through May of 2012, that she had visited them at least three or four times here in Illinois. The temporary order was issued on May 11, 2012. For the previous three months before that, from February until May, in February, Mr. Campbell found out he was being deployed. He did not advise my client of that. His girlfriend at the time advised my client that he was being deployed for six months. Ms. Wenzel testified during the trial that all through the criminal proceedings, she was trying to get a transfer, first to Las Vegas and then to Illinois as soon as she found out they were coming to Illinois. She was in that process the entire time of the criminal trial. Once the criminal trial was over, she was then deployed herself for a period of time and then secured the transfer to Illinois as of April 2012. She took a job outside of her career field in order to move to Illinois to be near her children. Ms. Wenzel testified that she always asked how the children were doing. And the response that she would get was, okay, fine. She never had any indication that there was any problems with schooling. She never had any indication that there was any need for her to contact the schools because Mr. Campbell didn't give her the information. The court in this case found that the lack of communication from Mr. Campbell to Ms. Wenzel was significant. The court also used and laid out within the order that was issued on June 12th what the court found to be the change in circumstances. One, that the children and both parents were living in the same state in the same school district for the first time, honestly, since 2008. That the children were subject to individual education plans, IEPs, and that those are within the school district in O'Fallon, Illinois. Ms. Wenzel testified that she is on controlled orders at Scott Air Force Base, meaning she was not subject to deployment or TDY or to be reassigned until the spring of 2014. She also testified that she does not intend to re-enlist in the United States Air Force and intends to separate from the Air Force as of the spring of 2014. Mr. Campbell testified that he was subject to deployment and TDYs, as is obvious as that's part of what happened in this case. And that he's also still subject to being transferred to different bases. The court also found that the family dynamics between the parties, the parties' spouses, and Ms. Wenzel's new child, also come into effect with the children. As well as the communication and the further military status. The court in this case, the temporary order that was issued in May, when Ms. Wenzel presented to the court, these people had joint custody of these children. And Mr. Campbell had unilaterally decided that the children would be better off with his parents during his deployment than with their own mother. And that she would get her court-ordered visitation of six weeks in the summer. She felt that it was best for these kids because at this point she did know about the IEPs. She did know about the school problems. She had been advised that the counselor had recommended further outside counseling for these children that the father was not attending to. So she felt that it was going to be in these children's best interest to remain with her during the deployment. The parties, the testimony of Ms. Wenzel and Mr. Campbell was that they were trying to discuss this prior to his deployment. And she testified that as of May 10, 2012, he sent her a text message that said, I've decided they're going with my parents. And that she could have her six weeks of visitation. And Mr. Groninger wants you to consider Sections F and G of the Section 610 of the IMDMA, which were enacted after the deployment even began. Which were enacted after this situation arose. And I urge that the court not consider those with regard to the temporary order. Furthermore, when Mr. Groninger also has argued within his brief that upon his return from his deployment, the children should have been returned and custody should have been returned to the father. I would like to point out, it is in the record, that in November, Mr. Campbell filed a motion for return of custody. And then in January 2, 2013, there was an agreed temporary order that was entered and signed by both of the parties in this case. Which the court entered, and it says, number one, petitioner shall have temporary primary physical custody of the minor children. It was an agreed order. As of January 2, 2013, he agreed to the temporary custody of Ms. Wenzel. So I don't believe that the court should find that it's against the manifest weight of the evidence that the trial court entered the temporary order. Given that he did, after the fact, agree to it. And I would argue has waived his argument that it was improper. As far as the full modification goes, with regard to everything that's in the record, I don't think that the court can find that it's against the manifest weight of the evidence that was presented to the court that the modification was in fact, or that there was in fact a clear and convincing evidence that there was a substantial change in circumstances and that it would be in the best interest of these children for the modification to occur. The court cited in the order of January 12, of all of the facts and circumstances that the court found to be substantially changed, the guardian ad litem had recommended the change in the modification in the custody. Guardian ad litem, in the report that was issued and filed to the court in April, April 12, 2013, the guardian ad litem indicates that she spoke to several people, including the children and the parties, the school counselor, the other counselor, the principal. And she felt and recommended to the court that joint custody should continue, but the primary residential custodian should change because the children were thriving at this point with their mother. And again, April of 2013 was after Mr. Campbell had agreed to the modification on a temporary basis of custody. Mr. Campbell also, Ms. Campbell testified, Ms. Wenzel, I'm sorry, testified that Mr. Campbell refused to give her any information. He refused on occasions to let her speak to the children. He refused on occasions to let her see the children. That when he did provide information, it was a bag, a plastic grocery bag of information when she would come to visit the children. He would give her a bag of stuff. That includes artwork, it included schoolwork, it included any other kind of things that the children had done. And she testified that there were never any IEP paperwork included in any of those papers. Mr. Gruninger has said that he was under no obligation to provide that information to Ms. Wenzel. However, I would argue that the divorce decree that was entered, which is in the appendix of the appellant's brief, page A-17, actually on A-19, it says that each parent will have full access to the records and that each parent will notify the other of the children's school, athletic, and extracurricular activities. That way, they have information with regard to their children. I believe that that would, in fact, raise the obligation for him to provide the information to Ms. Wenzel so that she could, one, be involved in making the decisions for her children since she did have joint custody of them, and two, so that she would have the information pursuant to the divorce decree. Mr. Gruninger wants you to believe that she completely ignored her children for 30 months. That is refuted in the trial testimonies, refuted in the records. She testified that she went and visited her children as often as she could. Mr. Campbell admitted and testified that she came on several occasions while they were in Las Vegas and also on several occasions, at least three to four occasions, once they had moved to Illinois. As far as Mr. Gruninger's statement about no gifts or cards or things of that nature to the children, I don't believe that that's actually in the record. I don't believe that there was any testimony about those issues. So I don't believe that that is proper for the court to consider today. As far as... So given all of the evidence that was presented to the court during a two-day trial in this case, and the recommendation of the guardian ad litem after sitting through the two-day trial in this case did not change, she testified on the record at the second day of the trial that she also agreed and continued with her recommendation that the modification should happen. So I believe that the court cannot find that it would be against the manifest weight of the evidence for the trial court to have found that there was a substantial change in circumstances and that modification in this case would be in the best interest of these children. The third issue is with regard to the tax exemption and whether or not the trial court abused its discretion when it modified the judgment in dissolution in modifying the tax exemptions. In the judgment of dissolution in marriage, Mr. Campbell was awarded both of the tax exemptions for the children and Ms. Wenzel was ordered to pay child support. When Ms. Wenzel filed her motion to modify, she asked that the tax exemption be modified as well. In the record, the court will find in the court file, that there were position statements filed by both parties, both of which indicated that both parties believed that they should equally divide the tax exemptions. There was no testimony really taken about it at the trial. I think the focus was on the custody at the trial. So there was no evidence presented with regard to the expenses of the children or with regard to finances or the tax exemption. But I would advise the court that the position statement that was filed by Mr. Campbell stated that it was his position that the court should split the tax exemption between them, that they should each take one. Thank you, Your Honor. How long was SharePoint going to be deployed? What was the period of time? It was deployed for a period of six months from May of 2012 through November of 2012. Is it your position that the mother had no say in where those children resided during that time as a joint custodian? Since they did have joint custody, if they couldn't agree upon it, it would have been incumbent upon her to file a petition with respect to just that period of time. In fact, the initial order that was entered in May of 2012 said for his deployment, but then that was never taken up again after he got back from deployment in November of 2012. But it appears that he agreed to the temporary custody change. On January 2nd, 2013, he entered an order, and then he filed a petition asking for temporary custody back on January 29th. So he immediately turned around within 30 days and filed a petition to modify that. And that was what I was going to bring that point up because she didn't tell you that. With respect to access to records under the divorce, the divorce decree specifically stated the parties were entitled to access to records. I don't necessarily believe that that makes the father, you know, puts upon him an obligation to send her anything and everything. Where is the mother's obligation to contact the school if she has questions herself or to get records directly from the school? He was already doing more than I think he was required to do by providing her the paperwork that he did provide, and that certainly would have tipped her off about which school the children were in that she could have contacted the school. And I'm talking about initially the one in Vegas and then later the one in O'Fallon. So I don't think it necessarily makes the father a slave to providing all that information to the mother. If she is truly interested in these children, she would take the step, the initiative, to go find this information out on her own. A couple other things that were mentioned. First of all, with respect to one of the things that the mother did immediately when she got here in Illinois in May of 2012 is she changed the pediatricians of the kids. Here's a situation where the father had had the children being seen by a pediatrician during the entire time he was here in Illinois from 2011 up until May of 2012. She comes into town. She's here three weeks. She's first becoming reacquainted with the children, and she immediately changes their pediatrician. And I think that's the kind of judgment or lack of judgment that I'm talking about that affects her decision-making with regard to this. And along those same lines, one of the things that opposing counsel cited in her brief was that, and she just talked about a moment ago, was the fact that the father was preventing the mother from seeing her request to visit with the children. That only occurred, and the site that's in the record only occurred during that short time period after she got here in Illinois in April of 2012 up until the time that he was deployed in May of 2012. Well, he's about to be deployed for six months. She's now here in Illinois. She's going to be seeing the children on a regular basis. Of course he wants to see the children as much as he can before he leaves for his six-month deployment. That's why he wasn't acquiescing to her wishes to see the children constantly during that three-week time period prior to him leaving is because he had an interest in seeing the children too, especially knowing he was only going to be able to see them by Skype or telephone calls or whatever the case may be for the next six months. So I don't necessarily think it's instrumental to begrudge the father or effective to begrudge the father for not letting the mother see the children during that specific time period. And that's the only time period that's cited in the record. Lastly, with respect to the move to Illinois without leave of court, the mother never said one word about that. At any point in time, she never objected. She knew they were both in the military. She knew he could be PCSed any time. She knew he was in Las Vegas for a set period of time because of a school. She knew that at the end of that time period, he would be PCSed somewhere else, transferred to another duty station somewhere else. And so she was fully aware of that. That's why she didn't object. She knew ultimately she could leave Hill Air Force Base in Utah herself. And that's ultimately what she did. She got a transfer to the base, the same base as he, back here at Scott Air Force Base. So I don't know that necessarily she should be begrudging him because it pretty much facilitated. She was leaving anyway because that Hill Air Force Base in Utah is where the sexual assault occurred, and she wanted to get out of there anyway. So I don't necessarily think that she should be begrudging him for transferring to another duty station without getting leave of court, especially in a situation like this, and I'm talking about leave of court from Nevada where the divorce was, especially in a situation like this where he comes to Illinois, and he's at Scott Air Force Base, and she hadn't been having any interaction with the children for a two-and-a-half-year period. So I don't necessarily think it's appropriate for her to begrudge him for not getting leave of court with respect to this. And lastly, one of the other points that opposing counsel just brought up is his idea, his thought, was to place the children with his parents during the period of deployment, but still allow the mother all her visitation and, in fact, allow the mother to have the children for the 2012-2013 school year. There was only a few days left in the school year. It's now May of 2012. Thank you. Thank you.